So, good morning, your honors. Thank you for taking this case on such an expedited schedule. We appreciate that. The case is an interesting case. It's an important case in this circuit and, frankly, across the country. Our sense is that it presents a question that, if not one of first impression, very nearly one of first impression, at least when it comes to published opinions in this circuit. I'd like to acknowledge that it's been a long week for you all. We're the last, we're the last argument. Don't worry, we have our full attention. Okay, I appreciate that. I would like to, if I could, begin slightly unorthodox fashion by fixing a few sites in our brief. The first one I have is in our opening brief on page 25. There are some record sites and at the end of the carryover paragraph, a couple of those sites just don't apply. I think they're just wrong. And I would, I would add a site which is ER 445, take out the site to 174 of the of the record, and take out the site of 455. For what proposition, please? The proposition was that that during the two months that that the that the family was here, we can use that term in the United States, right after the birth of the child, they were preparing to go to Italy and and make a go of it as a family in Italy. The next problem we have with some sites are our case sites and and it's on page 49. There are some the uses of the the short form id that are just plain wrong. It's really the holder decision there that is cited in the first paragraph for the proposition that it's the children's habitual residence. That's a fundamental inquiry. And then the last the last sentence of the paragraph before heading B on page 49. Again that's that's a holder site and it should be holder 392 F 3rd at 1016 for the first site and then the second one is id at 1014. And then the one that's most... Is there some reason why you didn't submit this in writing? This is pretty unusual. Yeah, there is a reason. I didn't find it until I started reading through more carefully in preparation for the argument. I apologize for that. Your apology is accepted. I've just one more. Oh, all right, go ahead. And this is this is the last one and there is a sense on page 51 where we say that this court has has has has decided an issue that looks a lot like our case. It's actually the Second Circuit. So on page 51 when we talk about this court and we cite the Guzzo versus Cristofano case, that's obviously a Second Circuit case, not this court case. All right, because I'm in a generous mood this morning, clerk, go ahead and restart the clock at 15 and let's hear some argument. We got your sites. Okay, thank you. So the reason this court, the reason that this case is so at this issue of habitual residents of newborns, especially in our in our opinion, it's a it's a newborn that's born under a cloud of disagreement about where habitual residents will be. My reading of the briefs would indicate that I don't see many issues that aren't covered. I don't see many issues that I need to re-couch or re-characterize here today. I'm more than happy to take questions. Well, I guess for the obvious reason that a newborn doesn't yet have the cognitive abilities to make that determination, what's wrong with the case law that suggests we look to the shared intent of the parents in answering that question, at least until the child reaches the age when he or she can decide for themselves? I don't think there's anything wrong with looking to the shared intent of the parents. I think the problem we have in this case is we don't believe there was a finding of shared intent, at least in the October 2010 period. I thought we had a finding by the district court that the the shared intent was formed right after the birth when the plan was made to give Italy a trial shot, but to do all the steps that Ms. Hayes undertook to establish links to the United States, if I can use that term. Well, and that's the first argument, our first attack on the district court decision below, is that there really isn't a finding of shared intent. There is certainly a finding of settled intent on behalf of Ms. Hayes, but the court was careful, and we pointed this out in our reply brief, that you look in vain for a passage in the district court's decision where the court finds shared, settled intent. The court sets up the argument as a search for shared, settled intent, and frankly, we don't take issue with the with the court's decision that Mr. Pennacchia didn't prove shared, settled intent for Italy as well. We're not we're not going that that far with it. We're just saying there was no finding in the district court that there was shared, settled intent that the United States... Counsel, I'm looking at ER 7 of Judge Lodge's order, the fourth line from the top, where he says thus the court will, quote, look for the last shared, settled intent of the parents, end quote, citing to Murphy, Valenzuela, Mosey's. I mean, he's essentially setting out the correct test. Why shouldn't we assume he followed it in awarding judgment in favor of Ms. Hayes? Because he doesn't say he followed it. He sets it up correctly. We concede that it's set up correctly. But how can I assume he did it wrong if he cites to the correct... Is your argument that his factual findings don't support his legal conclusion? My argument is, well, twofold. One, he didn't make a finding that was necessary, which is shared, settled intent. He made a finding of settled intent on behalf of one of the parents. My second argument is that he did, if he did make a finding of shared, settled intent, that it's clearly erroneous. Given another finding that he made, that Danilo actually did have an intent to go to Italy instead of the home. You said something earlier in your argument, if I could, because I think it's important. You said that there may be a question of first impression here, and you alluded to the fact that you thought that might be the case because this was an infant. But what you're arguing now in response to Judge Tallman's questions is that Moses, which we I think reaffirmed in much more recently in Murphy, is indeed the test. Yes. Okay, so then it doesn't sound to me like you're asking us to adopt a new test. What's the first impression part of this case? Is it the age of the child? The first impression part is alluded to in the ALC case, the unpublished decision and that we cited for its persuasive value, obviously not for its precedential, which is, and Judge Tallman mentioned it as well, what do you do with, if the inquiry under the convention is to look at the habitual residence of the child because you want to protect those interests, what do you do with an infant? Yes, but that's why the Moses test and the Murphy test are so important and I'm sure it's why you use the phrase born under a cloud of, yeah, because that comes straight from the unpublished decision. It does. But to Judge Tallman's point, babies are all born under a cloud of, right, they don't have their own intent. And furthermore, and think more to the point, Moses and Murphy, that line of cases in the Ninth Circuit really focuses on the parents' intent, right? The parents' shared, settled intent. Yes? It does. Okay, so why is the first impression part of this that causes us to need to stretch? We don't have shared settled intent. Okay, so if that's the case, then it's not a legal issue and that's what I'm trying to hone in on. Then I think you're really going to a factual issue that you think was inadequately established in the trial court. Is that right? Or an erroneous factual conclusion, I should say. Is that right? That is correct. Okay. Yes, Your Honor. On that point, and we have said so, that we believe it's incompatible with the other finding the judge made that in 2010, Mr. Panacchia was actually showing forth his intent that Italy be the place of habitual residence by taking out a mortgage on his house. Counselor, I'm having a little difficulty. Maybe I just read Judge Lodge's order differently than you do, but I'm looking at the language of his order on ER 10 and 11, which are pages 10 and 11, where he finds first that your client failed to prove by a preponderance of the evidence that the evidence was corroborated. He makes an adverse credibility finding on the top of page 11 with regard to your client's testimony. He makes a specific credibility finding as to the viability of Ms. Hayes' testimony, and further finds that her testimony was corroborated by other witnesses in the case, and then finds the last full sentence, or the last paragraph above the footnote on ER 11, that the court finds the evidence shows the settled intention was for SAPH's habitual residence to be the United States, and that's after he cited our case law talking about shared settled intent. Well, how can I not read that as the court applying the facts to the law and rendering judgment finding that the habitual residence was U.S.? First reason you can read it as not addressing the shared aspect of that is back on ER 10, the court makes a finding that Mr. Pinocchio took actions evidencing his intention was for SAPH to reside in Italy. Well, that may all be true, but then he makes a credibility determination that essentially rejects your client's testimony that it was always intended that the child would essentially establish habitual residence in Italy. All I can do is work with what the court said, and the court said I find that there was Mr. Pinocchio had the intention that Italy be habitual residence on ER 10, and then at the bottom of ER 11, when you when you mention what the court summed up with, it's to us, it's plain that the court did not use the word shared. The court says settled intention. Okay, so I'm looking at 10 and 11 also. I have a big blue box written around, drawn around this. It says the court finds petitioners failed to prove by a preponderance of the evidence that the party's, plural, intention was for SAPH's habitual residence to be Italy, and I think you've been clear in saying you agree. You didn't find that. All right. We're not taking, we don't take issue with that. Right. Instead, the court finds the evidence proves that SAPH's habitual residence was and is the United States. Is your, is your problem that right here where he said SAPH's habitual residence, he didn't say shared, settled intent? That's right, and our problem, my problem is as well in the language that Judge Tolman was quoting on ER 11, which is the final sentence that carries over to ER 12. The court, in our opinion, pointedly avoids the word settled. Okay. Or shared, I'm sorry. If we find earlier in this opinion that the court has correctly cited the standard, then is it still your position that this language right here is just insufficiently precise, that he's missed the mark? That is my, that is. So the whole case turns on the absence of the word shared? It does not, Your Honor. I want to make that clear. Well, if the court had inserted the word shared in the sentence that Judge Christin just read to you, would that conclusively establish that that was indeed the holding of the court? That would have conclusively established that the court had found, yes. So the whole case does turn on the dog that didn't bark. No, it doesn't. I'm sorry to interrupt. I apologize. What I would say is it does not, because there is still this issue of acclimatization, and Moses makes clear that you can abandon, even if the parents don't agree, you can abandon and acquire a new habitual residence if, over time, you're there. And the court recognizes that starting under the section B, acclimatization, that begins on page 12. Exactly right. And now we're into the general question of habitual residence, which is the mixed question of law and fact. And if we concede the initial acquisition of habitual residence in the United States, as we will now for purposes of this aspect and part of my argument, then the question is, did the court actually look at all the record evidence, and in a mixed question of law and fact scenario, did the court find and make the proper finding on habitual residence? And our claim is that it did not. That Judge Lodge did not sufficiently weigh the evidence, didn't even address what we see as the most important part of that evidence, which is this expert assessment that was done in Italy, doesn't address the parties, the Italian courts, counsel for the parties, everyone's unanimous acknowledgment in 2013 to 2016, March of 2016, that habitual residence of this child was Italy. But I thought the court said the reason that there's a distinction between the meaning of that phrase under the 1961 convention and the meaning under the convention that controls in this case. The court certainly says that. The court gives us no hint as to what the reason. Well, the problem, of course, is that they custodial rights. The other deals with abduction or removal or retention of children. So it's possible that it means something. Habitual residence under the 1961 convention could mean something as simple as where does the child live right now for an Italian court trying to decide a custody dispute. It's possible, but there's no reason for us to believe that the same term should have different meanings across... But we do that all the time with congressional statutes that use the same terms, but the law means something different in context when used in one statute than it does in another. I understand that we do, but we generally have a reason. We generally say, oh, it's a different context. I can think of one reason. If you're talking about custody issues, presumably the court first has to have jurisdiction over both the parents in resolving who gets the child. Maybe not. I haven't looked at the 61 convention that closely, but in this case it did, right? Ms. Hayes was the one who initiated the proceeding and your client was participating in it, right? Correct. All I can say, Judge Tallman, is that the commentators who look across the conventions that are the result of this Hague conference have said it's a term that has been used for 120 years. And the reason they left it... Why didn't they define it? If everybody knows what it means, then how about putting a provision in the convention that says, habitual residents shall mean blah, blah, blah, blah, blah. I think Moses gives us its best guess as to why the treaty drafters didn't define it. But there's just too many factors that can go into... It's an international treaty. And the point is, just give it its plain meaning. But Moses doesn't do that. And the Italian order just internally suggests that they've used the term differently, counsel. I want to give you an opportunity to respond. Okay. At ER 298, the Italian court concluded that Italy was Saf's habitual residence because she resided there. It just flat-out says because she resided there. And that's quite different than our test. Can I look at that and reserve two minutes? Absolutely. You bet. You bet. Okay. Thank you. Thank you, Your Honors. May it please the Court, I am Murray Feldman, arguing for the appellee, Dina Michelle Hayes, this morning. In response to the appellant's arguments, we have the following key points. First, we don't think this is an issue of first impression. This Court's published decisions in Moses and Murphy, the two decisions in Holder, provide adequate guidance on how to evaluate this issue, the facts in this case, and the review of Judge Lodge's decision. And recognizing that, Judge Christin, I know this morning, for instance, you've been asking a lot of counsel, what's your best case on this issue? And I couldn't give you a single case. And the reason is, it's because, as the Ninth Circuit's Hayes cases note, it's always the unique facts and circumstances of each case. So there's no one case that fits perfectly with Ms. Hayes' situation. So is your argument, we know what the rules are. It's a question of how Judge Lodge's order of fact applied the facts to the rules. Yes, Your Honor. The thrust of the appellant's challenge seems to be a challenge to the factual determinations and the evaluation of the evidence that Judge Lodge made, and under the clear error standard of review that applies to that part of this Court's review, the review of the factual determinations from the District Court. And as this Court has said, it essentially accepts the historical narrative established by the District Court, unless clear error can be shown. And the appellants haven't established clear error here. So that there was a finding of shared intent that was made by the District Court. I think in the panel's questions, they've identified where that is in Judge Lodge's decision. There is record evidence to support that finding. Even if Judge Lodge had not made the finding, there is enough evidence in the record to support this Court making that finding in its review. And that the habitual residence arguments that are being discussed at the end of appellant's argument based on the Italian custody proceedings, they're flipping the required analysis here. And those arguments mistake custody jurisdiction for habitual residence. And these are two distinct concepts, with that distinction recognized by this Court in the Mozes decision and the Firstholder decision. That's at 305 F. 3rd. And other courts have noted this. Other circuit courts, including the Eighth Circuit in the In terms of these questions about how the treaty and the convention should be interpreted, and this potential tension between the 1961 convention that the Common Court of Rome was looking at to establish jurisdiction and habitual residence there, and the 1980 convention, that's at issue here. It seems both the Eighth Circuit's decision in Barzilay and this Court's decision in Asvesta, which was the review of the Greek determination in a Hague convention proceeding, are most helpful in trying to evaluate what level of comedy or preclusion should be afforded to a foreign court's judgment. And in Asvesta, this Court established that you could make a more searching inquiry in looking at a foreign court's judgment in this 1980 Hague convention context. And the question to be asked then was whether the foreign court was actually applying the 1980, not only was it actually applying the 1980 Hague convention, but it was applying it reasonably and in a way that this Court has applied it here in the United States. And in both Asvesta and Barzilay, the courts relied in part, or at least referenced, the restatement third of the law of foreign relations of the United States. And if this panel is going to have any questions on treaty interpretation issues, that would be one place to look, is that reference. And interpreting different statutory provisions, and hence a similar rule for treaty construction, in different ways. It's not cited in any of the briefing, but this Court this past July in the Tecumseh case recognized that proposition in a footnote. It decided not to apply it there, that the rule of consistent usage readily yields to context and the statutory objectives. So this circuit recognized it there, and the Supreme Court has applied it, for instance, in the Environmental Defense versus Duke Energy case at 127 S. Court 1420-1423. And these concepts of the rule of consistent usage, which if we're going to put a catalog on it or a box on it, is essentially what appellants are relying on in that habitual residence argument in the 1961 convention use and application in the Italian Court. If it's the rule of consistent usage, then it is the same rule noticed in the restatement for the interpretation by this Court of international conventions. So one of the questions that kept coming up in a briefing was saying, and we didn't think as the appellee it was our burden to establish the argument on the treaty interpretation, because it is the appellant's burden to show that the habitual residence was in Italy, but nonetheless the finger kept up pointing back to us to say, well, neither the why the terms might be construed differently, but that's, or at least that's the authority. In addition to the reasons that Judge Lodge gave in the district court's decision, I think we're very well taken and are consistent with this court's framework. His argument is that they aren't well taken. His argument is, I mean just to play devil's advocate, his argument is that what the district court seized upon were instances that demonstrate what mom's intention was, not that they were shared. Do you want to respond to that? In terms of the initial finding on habitual residence in the United States? Right. It was, it was... Talking about the Social Security, the college account, those examples that the judge cited, his argument, opposing counsel's argument, is that those evidence Ms. Hayes' intent and not his claim. Right. They do evidence the mother's, Ms. Hayes' intent, but the point then was there was also testimony that was provided that the district court found credible where she presented her position, and this is on, in the transcript at ER 114 to 15, and Ms. Hayes states, we agreed to go, she was referring to Italy on a trial basis, they said, I agreed that I would take her, the child, Saf, there with the understanding that if it did not work out, Saf and I would be returning to the United States. And she further testified that the child's permanent residence would be in Redmond and that we'd go to Italy on a And he said, and you had discussions with Mr. Panacchi about that? And Ms. Hayes testified, yes. And then the question was, and he agreed? And the answer was, yes, there's no way I would have taken my daughter to Italy without his agreement on that specific fact. Did the parties execute, while they were still in Redmond, a document by which they named guardians for the child in the event that the And, yes, Mr. Panacchia agreed to and signed that, that document. Now, there was, there was some discussion in the district court about what language it was presented in, whether he understood it, but that was the points where the district court made the credibility determination and held that he did understand it. Thank you. How did it come about that Mr. Panacchia, thank you, that Mr. Panacchia executed a document authorizing or giving permission for Ms. internationally with the child for, I think, I think it's a five-year period, 2012 to 2017 or something like that. Right, until December of 2017. How did that come about? That is, in the beginning, as is documented in the record, there were still frequent travel between Italy and returning to the United States. And then on, on one of those trips, and this comes up in the January 2012 period, Mr. Panacchia was, was returning and the mother and the child and the nanny were still staying here in the Redmond area for a few more days. And it's in Ms. Hayes' testimony, she recites that Mr. Panacchia became concerned that the original passport issued to the child had the last name of Hayes, because that was based on the original birth certificate, which didn't identify the father. Then later, in the state of Washington, there was an amended birth certificate that identified the father's name, and he started voicing a concern that the name on the passport did not match the name on the birth certificate. So Ms. Hayes agreed to change that at his request, and he then, in January 2012, provided that consent was necessary for the passport office here in Seattle to issue a new United States passport for the child. And so that's... Had, had he authorized the original U.S. passport? I don't know how one gets a passport for an infant. I, I assume at least one of the parents has to sign. Do both? Was there any evidence about that at the hearing? The, the discussion in the record is that, in the testimony, is that Ms. Hayes obtained that passport for a child. That was one of the steps that she took. But my question is more specific. Did it also recall, recall, excuse me, require the co-signature of the father as well as the mother? I believe the record's silent on that, Your Honor, that it wasn't addressed. But he did provide that consent in January 2012, and so the original question, Judge Kristen, about then the authorization to travel, that was sort of paired with that, because then the child had a passport with a different last name than the mother's for them to, to travel together and avoid any problems. He, he provided the authorization for a minor to travel. And those were executed at the same time? Yes. Okay, thank you. Yes, and, and our point was that how that authorization was framed, it was authorizing travel out, international travel to any country outside of the United States, then with the presumption being the place of return would always be the United States, which was the child's habitual residence. On the, the acclimatization inquiries, Your Honor, we recognize that even if there is a determination of the shared intent, and the shared intent was to be in the despite parental intent, there could be a sufficient passage of time for, and even in the absence of, even with parental intent to the contrary, that enough time could pass that a child's habitual residence can change. And, but we would submit that's not the case here, as Judge Lodge properly found, because as this Court has held, absent a settled parental intent, acclimatization should only be inferred where the objective facts point unequivocally to a person's ordinary or particular place. But here, Judge Lodge appropriately credited the strong ties that remain to the United States and, and based those on a number of factual findings. And it's important, too, that in Moses, I believe it was Judge Kaczynski writing for the panel there, he noted that there can be circumstances that hinder acclimatization. And that is really the thrust of our argument in terms of the timing on the acclimatization issue, that as we were just discussing, the father authorized, consented to the issuance of the U.S. passport in January 2012, but then when that passport was stolen in Italy in December 2012, and stolen only after the parties had then agreed that the mother and the child would be returning to the United States, or that she had informed the father that was happening, and the father had provided a written consent just a few months earlier, at the end of September 2012, saying that he was then their passports were stolen from the mother's vehicle outside the child's preschool. And at that point, the father refused to, his consent to reissue of the United States passport, as we noted, effectively trapping them in Italy. The point being, though, even though the time in Italy was from that first translocation, as Judge Lodge calls it, in the fall, essentially the start of November 2010 until August 2015, and we'll recognize that's a fairly long period under the cases, even longer, for instance, than the period in Murphy, but similar, we think, to the facts in Murphy, where the child was at school in Ireland for three years. What's interesting is the second holder case there, where the plan was to be in Germany for four years, although the mother returned with the children after eight months. But even then, it seems the court considered that even the four-year period, where it was an American serviceman being stationed overseas, that might not, even that long period might not be enough, and that certainly on the facts of that case, it wasn't. But our point being that these circumstances here, where they were trapped in Italy, hindered acclimatization, and so that period from December 2012 to August 2015 really shouldn't weigh as heavily in the analysis. It's part of considering all the unique facts and circumstances of the case, and that's essentially what Judge Lodge did, too, in his acclimatization analysis, as well as noting the facts that supported these ties to the United States, which included family, the English-speaking nanny, the attendance at an international trilingual preschool in Rome, where the child was known as the American girl, frequent travel to the United States. I believe it's just over, in the whole period they were in Italy, it's just over 300 days spent in the United States, so not quite a full year, but close to it. And even in the first two years, there were 171 days, over 20 percent, I believe, were spent in the United States. And the testimony was corroborated by two other witnesses, her plans for the child to return to the United States for elementary school here, and that even the child's classmate and best friend in Italy was a non-Italian. It was the son of an English-speaking United Nations agency employee there. So when you look at the immediate home environment and the ties there, and then again under the standard review, while this court might reach a different conclusion, Judge Lodge's conclusion is amply supported by the record. There are no further questions, Your Honor? No. Thank you very much. Thank you. Let me first respond to Judge Kristen's question about the Italian courts. Appears to be sort of a summary decision on habitual residence because the minor resides in Italy. The only thing I can say about that is that was not a contested issue in that case. There was no reason. I don't know that those two terms don't mean the same thing in Italy. These are translations, but I do know it wasn't contested. Part of it would be necessary to justify the court's jurisdiction over the child, would it not? I'm sorry, Judge Talmadge? Wouldn't part of the rationale for the court's reference to that fact be based on establishing that the court has jurisdiction over the child? That's exactly right. That was the foundational jurisdictional argument or finding made in the Rome Court. It's on the basis of habitual residence, so we don't lose the train of thought. My point was, it seems like in some parts of this document they're using the term habitual residence in a way that's inconsistent with the test that we have here. It's not the common law, where's this child live, but I mean common usage, understanding where's the child lives, so much as the shared settlement of the parties that controls here. Yes, that's exactly right. Let me just respond, if I can, to two points that were made at the end of Pelli's argument here. One, this point about the time frame that ought to be looked at for acclimatization because apparently the child was trapped in while Mr. Panacchia's use of and concern about his child not being brought back to Italy is nowhere near what we had in this Panacchia case in the Tenth Circuit. But more importantly, if Ms. Hayes thought that that itself could be unlawful retention in Italy, she could have brought a claim in Italy to say you are retaining my daughter in Italy. She is habitually resident in the United States and she needs to be ordered home to the United States. She didn't do that. Instead, she threw her counsel over and over again, used the term, now I understand it's on it in a different context or a different convention, that she is habitually resident in the United States. The last thing I want to say, the last thing I want to say about what a Pelli indicated was this issue about the best friend and the American girl and the things that were cited in Judge Lodge's opinion. The fact that all of that grew up in a certain place is important and relevant. The fact that she's known as the American girl in Italy, the fact that her best friend in Italy, I guess my point is looking at the totality of the circumstances, as this court is not only authorized to do under Moses, but it is, I believe, the duty to do in looking at habitual residence. Our sense is that it's not really a close question of where this child's normal home was. Where did she always return? Where did she develop? You could have a similar situation, could you not, with the Holder children on a U.S. military base in Germany? Well, in the Holder case, the court makes mention of the fact that on a military base, it's different. It's not only is it not, it's American soil and it's American schools and it's the PX and it's... Okay, take State Department Foreign Service officers who are posted to Rome. You know, maybe the parents work at the embassy, which is a government reservation in a foreign country, but their kids are going to be going to Italian schools and could easily fit all of the factors that were just mentioned. Well, it's a good point. I've never, I've not seen a case and I don't know whether there's some other rule that applies when you're posted on a diplomatic mission that can't be used against you in that sense. But that's not the sense here. What we have is somebody who has gone to Italy, has made, even will concede on a trial basis, conditional basis, but an open-ended, indefinite basis, and continues to go back even after the marriage, or I shouldn't use the word marriage, even after the relationship breaks down. And again, the focus has to be on the child here. And as we mentioned, by any measure, under any analysis that looks at habitual residence and that ultimate finding, which is a mixed question of law and fact, that is reviewed de novo. But de novo with heavy deference to the factual finding. To the narrative facts, that's exactly right, to the narrative facts. Which we must find clearly erroneous. That's right, but I think Moses is clear that in applying judgment to those narrative facts and giving weight to them and legal significance to those narrative facts, that's a de novo review. And on that review, our sense is that even assuming the shared, even assuming initial US habitual residence by that virtue of that two-month period, she on August 23rd, 2015, when she was not brought back to Italy, she was a habitual resident of Italy. Okay, thank you very much. Thank you. Very well argued. The case just argued is submitted. We'll get an answer as soon as we can.
judges: Tallman, Christen, England